## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**TERRI MAYLE,**

   **Plaintiff,**

                                    **CASE NO.:**

**vs.**


**PERSHING LLC d/b/a**
**BNY MELLON,**

   **Defendant.**

_____/

## COMPLAINT & DEMAND FOR JURY TRIAL

Plaintiff TERRI MAYLE ("Plaintiff"), through undersigned counsel, files this Complaint against Defendant PERSHING LLC d/b/a BNY MELLON ("Defendant"), and states as follows:

## INTRODUCTION

1.    Plaintiff brings these claims for age and sex discrimination against Defendant for its unlawful termination of Plaintiff, in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626 *et seq.* ("ADEA"), the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq* ("FCRA") and the Florida Private Sector Whistleblower Act under § 448.101 *et seq.,* Florida Statutes.  Plaintiff is seeking damages including back pay, front pay, liquidated damages, punitive damages, reinstatement, lost benefits, compensatory damages, emotional distress damages, pain and suffering, injunctive relief, reasonable attorneys' fees and costs and any other relief to which the Plaintiff is entitled including, but not limited to, equitable relief.

2.    Plaintiff brings a claim for discrimination against Defendant, who subjected Plaintiff to workplace discrimination because of her age and sex.

## JURISDICTION

3.      Jurisdiction of this matter arises under 28 U.S.C. §1331 with federal questions involving the ADEA Title VII of the Civil Rights Act of 1964 under 42 U.S.C. § 2000e.  An express grant of federal court jurisdiction over this federal claims is found in the ADEA 29 U.S.C. §626.  Jurisdiction over state law claims also arise under the Court's supplemental jurisdiction 28 U.S.C. § 1367.

4.      This Court has jurisdiction over Plaintiff's claims because, at all times material to this Complaint, Plaintiff worked for Defendant in and around Orange County, Florida.

5.      Plaintiff is protected by the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626 *et seq.*

6.      Plaintiff is protected by Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e.*

7.      Plaintiff is protected by the Florida Civil Rights Act, as amended, Fla. Stat. § 760.01 *et seq.*

8.      Plaintiff is protected by the Florida Private Sector Whistleblower Act § 448.101 *et seq.,* Florida Statutes.

9.      Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 31, 2020. On August 31, 2020, the EEOC issued its right-to-sue letter.  Therefore this complaint is being filed within 90 days of Plaintiff receiving her right-to-sue letter ("FCHR"), alleging age and sex discrimination.

10.      Plaintiff received her Notice of Dismissal on Charge No. 511-2020-02372 dated September 9, 2020.

11.     Plaintiff filed this Complaint within 90 days of receiving her Notice of Dismissal.

12.     Plaintiff's claims are therefore timely filed.

## PARTIES

13.     Plaintiff worked for Defendant as a manager from 1992, until her termination on or about October 15, 2019.

14.     At all times material to this action, Defendant, was and continues to be a Foreign Limited Liability Company.

15.     Further, at all times material to this action, Defendant was, and continues to be, engaged in business in Florida, doing business in, among other counties, in Orange County, Florida.

16.     Throughout her employment with Defendant, Plaintiff primarily worked in Defendant's territory located in and around Orange County, Florida.

17.     At all times material to this action, Plaintiff was an "employee" of Defendant within the meaning of the FCRA and ADEA.

18.     At all times material to this action, Defendant was, and continues to be, "employer" within the meaning of the FCRA and ADEA.

19.     Defendant is an employer as defined by ADEA, as it employed over 15 employees for over twenty calendar weeks in each year relevant to this action.

20.     Defendant is also an employer as defined by the FCRA, as it employed over 15 employees for over twenty calendar weeks in each year relevant to this action.

## GENERAL ALLEGATIONS

21.     For over 27 years, Plaintiff (white, female, 60 years of age) was an excellent employee, a valued team member and a responsible manager.  Throughout her employment, she

3

was never subject to disciplinary or performance related actions.  Plaintiff successfully passed the Series 7, 63, 24 and 55 exams.

22.     Plaintiff managed a group of some half-dozen equity traders for approximately fifteen (15) years and no members of her team ever filed any complaints against her or even left the company.  Plaintiff was evaluated most recently as an "exceeds expectations" and was up for a letter- grade promotion from "M" to "S."  Plaintiff's record of performance and achievement has been consistent and unblemished.

23.     Over the years and throughout her employment, Plaintiff's work environment can best be described as a "boy's club."  When Plaintiff started working for Defendant, she was the only female on a trade desk which consisted of approximately 14 other male equity traders.

24.     In Defendant's "boy's club" environment, mistakes, vulgar comments about the bodies of other women in the office, inappropriate behavior and/or other incidents of misconduct have been routinely forgiven and looked over. However, in Plaintiff's case, she was always held to a double standard based on her sex (female) and towards the end of her employment, due to her age (60).

25.     Prior to Plaintiff being promoted to her last position held as the trade desk manager the trade desk was managed for approximately 40 years by Joe Dattolo.  Mr. Dattolo fostered the aforementioned "boy's club" environment where frequent screaming matches amongst employees, crude jokes, frequent swearing and inappropriate conduct was commonplace.

26.     Mr. Dattolo would also publicly humiliate everyone whenever the chance arose. In or around 2003, during Mr. Dattolo's tenure, male employees were typically disciplined less or not at all for more egregious offenses than women like Plaintiff.  More specifically, a good

friend of Mr. Dattolo, Sal Plattia was allowed to sit at his desk all day and play games on his computer.  For these efforts, he was rewarded by Mr. Dattolo by being given a promotion in 2000.  During the holidays around this same time and for many years thereafter, Sal would frequently say "suck my Christmas dick" to Plaintiff and others in the office without repercussions.

27.    In another instance, in 2004, the COO of the Company at the time, Rich Reinemann, asked Plaintiff if he could "pick you up in a limo and look at your tits."  Plaintiff obviously refused and when she reported this to Mr. Dattolo he just laughed about it.

28.    In one of the more egregious examples of the "boy's club" favoritism which permeated the Company, in or around 2006, Mr. Dattolo, along with 3 other male equity traders, were found exchanging pornographic images and submitting their expenses for their trips to the strip club for reimbursement to the Company.  Despite this extremely egregious conduct, Mr. Dattolo, remained in his leadership position.  Plaintiff was never even interviewed regarding her interactions with any of these male employees.

29.    After years of dealing with the "boy's club" environment as best as she could, Plaintiff was finally promoted to Director in 2007 by John Goodheart after a vigorous vetting process and firm-wide Committee review.

30.    Plaintiff was the first woman in the Equity Trading department to become a Director and was the only female Director in all departments for many years until the promotion process changed and no Committee review or sponsorships was needed.  Unfortunately, the promotion vetting process changed back to the old Committee and sponsorship process in approximately 2017.  Not surprisingly, after changing back to the old promotion process no

women have since been put up for promotion and/or have been promoted.  In or around 2010, Plaintiff was relocated to Orlando where she continued to lead her team.

31.     In or around 2017, Mr. Dattolo retired and it was determined that one of the key members to his "boy's club," Phil Muscarella, an options trader, would be placed under Plaintiff's leadership.  Mr. Muscarella, however, was used to the special treatment he would receive from Mr. Dattolo and Mr. Goodheart.  As such, he had difficulties adjusting to a female leader who held him accountable for his actions.   Prior to this, Mr. Muscarella was a peer of Plaintiff, but now she was managing him on her team.   When the change occurred Mr. Muscarella assured Plaintiff that he was ok with the change, but that some of his "boys" were "surprised that he was ok with working under a woman."

32.     In 2017, Plaintiff was promoted to manage the options desk in Orlando at which Mr. Muscarella and two others worked, as well as to continue management of her own equities group. Over the course of the next 2 years, Plaintiff worked diligently with Mr. Muscarella in order to get him to start thinking more strategically to provide a better client experience. Plaintiff had documented issues with Mr. Muscarella to which she frequently reported to Mr. Goodheart, including Mr. Muscarella failing to keep official trading books and records in violation of FINRA regulations.

33.     After Plaintiff became Mr. Muscarella's manager, their relationship concededly deteriorated. This was unquestionably because Plaintiff quickly came to learn how poorly the options trading was being conducted and how archaic their procedures were.  More specifically, Plaintiff's efforts to convert the options trading from paper to an electronic platform were challenged and rebuffed by Mr. Muscarella.

34.     Plaintiff made Mr. Goodheart aware of these challenges, and was supported by him in her efforts to modernize and improve the options trading function.  Plaintiff also quickly came to realize that Mr. Muscarella lacked the ability to think strategically.  Plaintiff and Mr. Muscarella discussed his shortcomings on numerous occasions and, Mr. Muscarella seemed to acknowledge it.  Mr. Goodheart was fully briefed on Muscarella's shortcomings.

35.     Plaintiff was thus supported by Mr. Goodheart when she determined she had to give Mr. Muscarella a "below expectations" rating on his first performance review as her subordinate.  Subsequently, in January 2019, in her second review of his performance, Plaintiff again evaluated Mr. Muscarella as "below expectations".  Executive management had decreed at least ten percent of employees must receive "below expectations" evaluations.  Given this mandate, Plaintiff had no alternative, but to give Mr. Muscarella the ratings he received. To do otherwise would have been grossly unfair to her other reports.

36.     At the time, Mr. Muscarella appeared to have understood this because when his July 2019 evaluation was coming up he went to Plaintiff and asked whether he could step down from his Director status and become a Vice President. Mr. Muscarella indicated to Plaintiff that if this were accomplished, he could achieve the new competencies set for a Vice President position, whereas he could not achieve the competencies required for a Director role. Thus, his evaluation process would have proceeded differently, to his benefit.

37.     Plaintiff supported his request and took Mr. Muscarella's proposal to John Goodheart, who liked it. However, when the proposal went up to Claire Santaniello, she was "dead set" against it expressing, according to Margaret Palermo, Ms. Santaniello's view that "nobody is allowed to step back".  This decision, clearly tied Plaintiff's hands and further

poisoned her relationship with Mr. Muscarella.  At the same time Plaintiff was advised that "he has to be managed out" by Ms. Palermo and Ms. Santaniello.

38.     During this same time period, in May of 2019, another employee Alan Levy, who worked in New York, expressed to Plaintiff a keen interest in taking a position on her team that had been occupied by Mike Leeming. Plaintiff met with Alan Levy and was enthusiastic about having him on her team. However, it would have required him to move from a Director to a Vice President position - a change he was willing to make.  But, once again, Ms. Santaniello absolutely refused because it would have required him to take a "step back."  During his interview and during the hiring process for Mr. Levy, Plaintiff expressed she wanted Mr. Levy for her team, but Ms. Santaniello nixed it due to Mr. Levy's age (approximately 56-57 years old). After not getting the job, Mr. Levy filed an internal complaint. Plaintiff was subjected to an HR investigation where she told Barbara Aurecchione the facts and the reasons why, in her view, Mr. Levy did not get the position.  Even today, however, Plaintiff has not been told the results of this "investigation."

39.     Mr. Muscarella claimed that Plaintiff also commented, during the hiring process for Mr. Levy, that "we don't need any more 60 year-old white guys." This is simply not so - and the true facts are quite revealing. The comment was, in fact, made - but it was made by Claire Santaniello at a Trading Manager's Staff Meeting (NYC, Jersey City and Orlando, video conference) where Plaintiff presented a slate of candidates to replace Mr. Leeming.  Ms. Santaniello told Plaintiff to keep looking and "that we don't need any more 60 year old white guys" referring to Mr. Levy.  In retaliation for Plaintiff's criticism of his work ethic and for reporting his FINRA violations, Mr. Muscarella retaliated against Plaintiff by claiming to HR that Plaintiff had said this instead of Ms. Santaniello.  Accordingly, Plaintiff subsequently denied

to the HR investigators that she had said this, and affirmed the comment was made by Ms. Santaniello.

40.     In late July of 2019, Plaintiff gave Mr. Muscarella his review, during which he came to her and asked whether his job was at risk due to his FINRA violations and his insubordinate conduct.  Plaintiff was candid with Mr. Muscarella in advising him that this could be so, after which he replied that this would never have happened under the management of their prior manager Mr. Dattolo. Two days after their conversation, Mr. Muscarella came into Plaintiff's office, stood up, yelled at her loudly and pointed his finger at her, and resigned.  While Plaintiff urged him not to, but he was resolute. John Goodheart was out of the country, so Plaintiff emailed Claire Santaniello, who responded by email that it was "probably for the best."

41.     Defendant has a rarely used policy that in these circumstances, management can request (or perhaps compel) the employee at the discretion of the company, to stay in place for sixty (60) days. Whatever one thinks about such a policy in the abstract, here its implementation, at the apparent insistence of Ms. Santaniello - and over the objection of Plaintiff - was disastrous. Mr. Muscarella disparaged Plaintiff, both to her face and to others, and ignored her after he tendered his resignation.  Plaintiff was the only manager on site in Orlando and because of his attitude and actions the working relationship between the two of them quickly became intolerable. More specifically, it got so bad that, in late August of 2019, Mr. Muscarella threatened Plaintiff's employment, in substance, telling her that he was hell bent on getting her terminated.

42.     Immediately prior to this and right before his performance evaluation was provided to him in or around July of 2019, Mr. Muscarella also went on vacation and had a co-worker, Nick Cox, complete the daily supervisory logs and sign Mr. Muscarella's name

fraudulently on the log book in his place.  This is a violation of FINRA Rules 3110, 4512 and 4510 as well as violations to Rules 17(a)(3) and 17(a)(4) under the Securities Exchange Act of 1934.  When asked by Plaintiff why he was doing this, Mr. Cox responded that Mr. Muscarella had ordered him to do so. In response, Plaintiff reported these FINRA violations to HR and Mr. Goodheart.  This incident is also documented in Mr. Cox's performance review.  Again, Mr. Cox was not terminated for this conduct despite the egregious FINRA regulatory implications of all of this.

43.     In another instance, Plaintiff told Mr. Muscarella after he resigned that "while he was still here, that he needed to respond to her when she asked him questions" during a client trading emergency. This instance, for whatever reason, was later used against Plaintiff despite the fact that she was just trying to do her job and deal with a rogue employee who was "hell bent" on smearing her reputation in an attempt to get her terminated.

44.     In the industry, the standard practice is when an employee resigns from a trading desk they are not allowed to work any additional days because it is a huge liability for the Company to have "rogue" trader placing orders on the trade desk after having resigned.   Again, however, "boy's club" rules were in effect for Mr. Muscarella and he received this preferential treatment over the objection of Plaintiff and to the detriment of the entire team/the Company.

45.     Shortly thereafter, on September 4, 2019, Plaintiff got an "invite" to a videoconference meeting to take place that same date with an HR representatives located in Pittsburgh who were unknown to Plaintiff. This meeting lasted about an hour and a half.  During the inquiry Plaintiff answered their questions to the best of her ability. Plaintiff was given no notice of the specifics of any complaint leading to this inquisition and she has never to this date received a copy of any complaint, a copy of that interview video, a copy of any memo reflecting

the interview, or any other documentation relating to it in any way.  Nonetheless, she was cooperative throughout.

46.     Just two days later, on September 6, 2019, another lengthy video interrogation occurred, conducted by the same two Pittsburgh-based HR employees.  Once again, Plaintiff answered their questions honestly and to the best of her ability until after about an hour when she asked, in substance, whether she should have her attorney involved. The two HR representatives did not substantively respond, but promptly took about a ten minute break, and then returned and said that they had everything they needed.

47.     About ten (10) days later, Matthew Engel, who identified himself as an attorney with the Defendant's HR department, called and advised Plaintiff that Defendant had received a demand letter from Mr. Muscarella and that he would be back in touch with her in a week or two. Plaintiff never heard back from Mr. Engel. Additionally, Plaintiff never received a copy of the demand letter. Instead, she was abruptly terminated in retaliation for reporting Mr. Muscarella's FINRA violations, her sex and her age.

48.     On September 17, 2019, Mr. Goodheart flew down to Orlando to take Plaintiff to dinner to discuss the investigation.  Again, Plaintiff affirmed that she never made the "no white males over 60" comment, but that it was, in fact, Ms. Santaniello.

49.     While John Goodheart attempted to be both professional and sympathetic when he terminated Plaintiff in Orlando, to the best of her recollection, Mr. Goodheart cited an alleged violation of the Code of Conduct without providing any specificity, other than to say that she did not cooperate with the investigation and "made people feel uncomfortable."

50.     As noted above, her lack of cooperation is completely false.  In addition, Ms. Mayle's termination was clearly based on her sex and/or age as Defendant was in the process of making succession plans for other older executives in the team.

51.     Despite Plaintiff's high reviews on her "nine-box" assessment it was clear that she did not fit Ms. Santaniello's mold "under 60 and white" because she was considered too "old" to be promoted upwards any further.  Instead, Steve Casler (white male, approximate age in his mid-40's), an employee who frequently did not receive "exceeds expectations" on his performance reviews was being groomed to take over when John Goodheart retired instead of Plaintiff.  Thus, as a result of her sex and her age, the "boy's club" at the Defendant finally succeeded against Plaintiff by using a rogue employee who had already resigned for performance/regulatory FINRA issues to make false accusations about Plaintiff which were taken at face value with little to no investigation into same.  Comparatively speaking, however, had Plaintiff been a male trader it is clear that she would not have been terminated for any of the alleged things she was accused of allegedly doing or saying.

52.     Had an investigation been done it would have revealed that Mr. Dattolo screamed and cursed at everyone, including Mr. Muscarella, all the time, but yet he was never fired or made anyone "uncomfortable."  In addition, any investigation would have also revealed Mr. Muscarella himself was involved in a screaming and cursing match during a conference call with another manager, Todd Hocking, but yet neither of those male managers were written up or terminated for their egregious and unprofessional misconduct as recently as July of 2019.

53.     It seems that only Plaintiff was held to this standard with respect to her termination while her male counterparts and team members received the benefits of the "boy's club" atmosphere.  Another member of the options team, Phil Polera, was employed for

approximately 40 years whereby yelled and cursed in an extremely vulgar manner at everyone all of the time on the phone, but yet he was promoted to Director in approximately 2009. His reputation was very well known for screaming at everyone, but yet nobody did anything about it because he was a member of the "boy's club." To this day, Mr. Polera is still employed and still frequently screams/curses at everyone he works with.

54.     Additionally Mr. Muscarella was allowed to be rude, curse at Plaintiff and be insubordinate for months, but he was not terminated until the incident came to a head after he refused to communicate with Plaintiff during a client trading emergency. Yet, all it took for Plaintiff to be terminated was some false accusations from Mr. Muscarella regarding Plaintiff who was simply doing her best to manage her team while having an employee who was actively trying to sabotage her career and the team in general.

55.     Upon information and belief, Plaintiff's position, team members and responsibilities were given to Mr. Casler (white male, approximate age in mid-40's). Furthermore, the Defendant further retaliated against Plaintiff by placing on her U-5 disclosure that she was terminated for violating internal corporate polices (not FINRA related). Having placed such a black mark on her unblemished 27 year record, without any evidence to substantiate anything besides mere hearsay comments, now makes obtaining alternative employment within the industry almost impossible for her.

56.     The actions by the Defendant were in willful violation of the laws stated herein or in reckless disregard for the tenets of the laws stated herein.

57.     Plaintiff has retained the services of the undersigned in this action and owes a fee to the same. Plaintiff will seek attorney's fees and costs relating to the prosecution of this matter.

<u>**COUNT I**</u>
<u>**VIOLATION OF FLORIDA'S PRIVATE SECTOR WHISTLE-BLOWER ACT,**</u>

## FLA STAT §448.102 AS TO DEFENDANT

58.     Plaintiff re-alleges and incorporates all allegations contained within Paragraphs 1 through 57, above, as if fully set forth herein.

59.     Florida Statute §448.102 *et seq.,* expressly provides that an employer may not take any retaliatory action against an employee because the employee has: "objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation."

60.     At all times material to this action, Plaintiff was an employee of Defendant within the meaning of Florida Statutes §448.101(2).

61.     At all times material to this action, Defendant was an "employer" within the meaning of Florida Statutes §448.101(3) and regularly employed more than ten (10) persons.

62.     Defendant violated Florida Statutes §448.102 by taking retaliatory personnel actions against Plaintiff, to include formally disciplining, changing the terms and conditions of employment and ultimately termination, because of her complaints to Defendant and/or complaining to an appropriate government agency where she possessed a good faith, objectively reasonable belief that Defendant's actions were violations of the Florida and/or Federal law and/or where Defendant's actions were actual violations of Florida and/or Federal law, including FINRA regulations and the Securities Exchange Act of 1934.

63.     Plaintiff had documented issues with Mr. Muscarella to which she frequently reported to Mr. Goodheart, including Mr. Muscarella failing to keep official trading books and records in violation of FINRA Rule 4510 and Rules 17a(3) and 17a(4) of the Securities Exchange Act of 1934 regarding books and records requirements.   More specifically, immediately prior to this and right before his performance evaluation was provided to him in or

14

around July of 2019, Mr. Muscarella also went on vacation and had a co-worker, Nick Cox, complete the daily supervisory logs and sign Mr. Muscarella's name fraudulently on the log book in his place.  This is a violation of the above mentioned FINRA regulations and the Securities Exchange Act.  When asked by Plaintiff why he was doing this, Mr. Cox responded that Mr. Muscarella had ordered him to do so. In response, Plaintiff reported this FINRA violation to HR and Mr. Goodheart.

64.     In retaliation for Plaintiff's reporting said FINRA as noted above and in this Complaint, Defendant disciplined, demoted and/or terminated Plaintiff's employment.

65.     Defendant and/or its agents, managers, and supervisors actively and knowingly participated in the retaliatory actions taken against Plaintiff having actual knowledge and/or constructive knowledge of the wrongfulness of their conduct and the high probability that injury and/or damage to Plaintiff would result, and/or acted with such reckless disregard for, or with an absence of reasonable care, as to constitute a conscious disregard for, or indifference to, Plaintiff's statutorily protected rights, and/or acted with such gross negligence that Defendant contributed to Plaintiff 's damages, injuries, and losses.

66.     As a direct, proximate, and foreseeable result of Defendant's actions, Plaintiff has suffered past and future pecuniary losses, back and front pay damages, punitive damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity, severe emotional distress, humiliation, and other non-pecuniary losses and intangible injuries.

## COUNT II
## DISCRIMINATION BASED ON AGE IN VIOLATION OF THE ADEA

67.     Plaintiff reincorporates and readopts all allegations contained within Paragraphs 1–57 above.

68.   Plaintiff is a member of a protected class because Plaintiff is over forty years old.

69.   At all relevant times throughout her employment, Plaintiff was qualified for the position she held with Defendant.

70.   After Plaintiff's termination, Plaintiff was replaced by a younger employee(s).

71.   Defendant's acts were intentional, with malice, and in violation of Plaintiff's protected civil rights under the ADEA.

72.   Plaintiff has been damaged and continues to be damaged by Defendant's illegal conduct and discriminatory actions based on her age.

73.   The above discrimination was done by Defendant with a reckless disregard for Plaintiff's rights under federal and state laws.   As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, back and front pay damages, punitive damages, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, great expense and loss of enjoyment of life.

WHEREFORE Plaintiff, TERRI MAYLE, demands judgment against Defendant for back pay, an equal amount as liquidated damages, front pay, other monetary damages such as loss of pension and retirement benefits, equitable relief, declaratory relief, and reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## COUNT III
## RETALIATION IN VIOLATION OF THE ADEA

74.   Paragraphs 1-57 are re-alleged and incorporated herein by reference.

75.   Defendant is an employer as that term is used under the applicable statutes referenced above.

76.     The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting Plaintiff under Chapter 760, Florida Statutes and 29 U.S.C. § 626 et seq.

77.     The foregoing unlawful actions by Defendant were purposeful.

78.     Plaintiff voiced opposition to unlawful employment practices during Plaintiff's employment with Defendant and was the victim of retaliation thereafter, as related in part above.

79.     Plaintiff is a member of a protected class because Plaintiff reported unlawful employment practices and was the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, back and front pay damages, liquidated damages, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of bonuses, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to injunctive relief

### COUNT IV
### DISCRIMINATION BASED ON AGE IN VIOLATION OF THE FCRA

80.     Plaintiff re-alleges and adopts paragraph 1 – 57 as though set forth fully herein.

81.     Plaintiff is a member of protected class because she is over forty years of age.

82.     At all relevant times, Plaintiff was qualified for the position she held with Defendant.

83.     After Plaintiff's termination, Plaintiff was replaced by a younger employee.

84.     Defendant's acts were intentional, with malice, and in violation of Plaintiff's protected civil rights under the FCRA.

85.     Plaintiff has been damaged and continues to be damaged by Defendant's illegal conduct and discriminatory actions based on her age.

86.     The above discrimination was done by Defendant with a reckless disregard for Plaintiff's rights under federal and state laws.   As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, great expense and loss of enjoyment of life.

WHEREFORE Plaintiff, TERRI MAYLE, demands judgment against Defendant for back pay, front pay, compensatory damages, liquidated damages, punitive damages and other monetary damages such as loss of pension and retirement benefits, equitable relief, declaratory relief, and reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## COUNT V
## RETALIATION BASED ON AGE UNDER THE FCRA

87.     Paragraphs 1-57 are re-alleged and incorporated herein by reference.

88.     Defendant is an employer as that term is used under the applicable statutes referenced above.

89.     The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting Plaintiff under Chapter 760, Florida Statutes.

90.     The foregoing unlawful actions by Defendant were purposeful.

91.     Plaintiff voiced opposition to unlawful employment practices during Plaintiff's employment in the form of disability discrimination with Defendant and was the victim of retaliation thereafter, as related in part above.

92.     Plaintiff is a member of a protected class because Plaintiff reported unlawful employment practices and was the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

93.          As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered back and front pay damages, liquidated damages, mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to injunctive relief.

## COUNT VI
## DISCRIMINATION BASED ON SEX IN VIOLATION OF TITLE VII

94.     Plaintiff re-alleges and adopts paragraph 1 – 57 as though set forth fully herein.

95.     Plaintiff is a member of a protected class due to her sex (female).

96.     By the conduct described above, Defendant engaged in unlawful employment practices and discriminated against plaintiff on the basis of her sex in violation of Title VII.

97.     After Plaintiff's termination she was replaced by a male sales representative.

98.     Defendant knew or should have known of the discrimination.

99.     The above discrimination was done by Defendant with a reckless disregard for Plaintiff's rights under federal law.  As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of employment, loss of

income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, great expense and loss of enjoyment of life.

WHEREFORE Plaintiff, TERRI MAYLE, demands judgment against Defendant for back pay, front pay, compensatory damages, punitive damages and other monetary damages such as loss of pension and retirement benefits, equitable relief, declaratory relief, and reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## COUNT VII
### RETALIATION BASED ON SEX IN VIOLATION OF TITLE VII

100.   Paragraphs 1-57 are re-alleged and incorporated herein by reference.

101.   Defendant is an employer as that term is used under the applicable statutes referenced above.

102.   The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting Plaintiff under 42 U.S.C. § 2000e.

103.   The foregoing unlawful actions by Defendant were purposeful.

104.   Plaintiff voiced opposition to unlawful employment practices during Plaintiff's employment in the form of disability discrimination with Defendant and was the victim of retaliation thereafter, as related in part above.

105.   Plaintiff is a member of a protected class because Plaintiff reported unlawful employment practices and was the victim of retaliation thereafter.   There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff

has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages are continuing and are permanent. Plaintiff is entitled to injunctive relief.

WHEREFORE Plaintiff, TERRI MAYLE, demands judgment against Defendant for back pay, front pay, compensatory damages, punitive damages and other monetary damages such as loss of pension and retirement benefits, equitable relief, declaratory relief, and reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## COUNT VIII
## DISCRIMINATION BASED ON SEX IN VIOLATION OF THE FCRA

106.     Plaintiff re-alleges and adopts paragraph 1– 57 as though set forth fully herein.

107.     Plaintiff is a member of a protected class due to her sex.

108.     By the conduct described above, Defendant engaged in unlawful employment practices and discriminated against plaintiff on the basis of her sex in violation of the FCRA.

109.     After her termination, Plaintiff was replaced by a male sales representative.

110.     Defendant knew or should have known of the discrimination.

111.     The above discrimination was done by Defendant with a reckless disregard for Plaintiff's rights under state law. As a direct and proximate result of the discrimination described above, Plaintiff has suffered and continues to suffer loss of employment, loss of income, loss of other employment benefits and has suffered and continues to suffer mental anguish, distress, humiliation, great expense and loss of enjoyment of life.

WHEREFORE Plaintiff, TERRI MAYLE, demands judgment against Defendant for back

pay, front pay, compensatory damages, punitive damages and other monetary damages such as loss of pension and retirement benefits, equitable relief, declaratory relief, and reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## COUNT XI
## RETALIATION BASED SEX IN VIOLATION OF THE FCRA

112.    Paragraphs 1-57 are re-alleged and incorporated herein by reference.

113.    Defendant is an employer as that term is used under the applicable statutes referenced above.

114.    The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting Plaintiff under Chapter 760, Florida Statutes.

115.    The foregoing unlawful actions by Defendant were purposeful.

116.    Plaintiff voiced opposition to unlawful employment practices during Plaintiff's employment in the form of disability discrimination with Defendant and was the victim of retaliation thereafter, as related in part above.

117.    Plaintiff is a member of a protected class because Plaintiff reported unlawful employment practices and was the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

118.        As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the

enjoyment of life, and other tangible and intangible damages.  These damages are continuing and are permanent.  Plaintiff is entitled to injunctive relief.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

Dated: November 18, 2020

Respectfully submitted by,

**/s/ Gregory R. Schmitz**
GREGORY R. SCHMITZ, ESQ.
Florida Bar No.:  0094694
20 North Orange Avenue, 15th Floor
Orlando, Florida 32801
Telephone:  (407) 204-2170
Facsimile:  (407) 536-9986
E-mail: gschmitz@forthepeople.com
        mbarreiro@forthepeople.com
        egeorge@forthepeople.com
***Attorney for Plaintiff***